Good morning your honors, Leanne Webster on behalf of Dr. Chang-Koo Yoon, good morning and may it please the court, unless the court has other questions and if I have time I'd like to talk about two issues this morning. First I would like to discuss the first issue presented in our briefs, the issue about the Blue Cross and Blue Shield investigations in the Colorado investigation and second I'd like to talk about the amount of loss issue. Starting with the investigations issue, here the district court abused its discretion by admitting this evidence which should have been excluded under rule 403. Starting first with the relevance or the probative value, the government said that it was only relevant to show that he was aware that he needed to comply with the rules. This is what the government stated repeatedly to the district court at pages 209 and 221 of the appendix and the district court clearly said this is the limited purpose for which it is admissible and if any additional evidence came in, including about findings of those investigations, that it would be too prejudicial. Counsel, when I read the papers my understanding was that the government was introducing this evidence because your client was pursuing a defense that there was no dispute that the billing was problematic and so his defense was that it was negligent rather than knowing and willful because he was overburdened with three different medical practices, he was juggling too much and these were just negligent errors. And so my understanding was that the government said, well, the fact that he was being investigated for his billing practices already is a direct response to the defense that your client presented. So I'm just, could you respond why in that very specific factual circumstance it would have been an abuse of discretion to allow it in under 403? Well, I think that there are a couple of reasons for that, Your Honor. So first of all, to the extent that the government is saying he had knowledge and then he committed from these investigations and then he committed fraud or continued to commit fraud, I don't think that that's necessarily reflected in the record just in terms of the timeline. So Martin Flood from Blue Cross and Blue Shield said that he began investigating him in early 2014 but did not send him a letter requesting records until 2015. But they didn't alert him that action was taken against him until 2018 and all the charge conduct goes back from 2014. So it isn't as though the Blue Cross Blue Shield investigation happened and then later on he continued. But it wasn't the finding, it was the fact of the investigation, right? So the problem is I'm lazy or I'm overworked or I'm too busy and I'm just thinking, oh, none of this really matters. And then they start to investigate me and the idea is at that moment I realize, oh, this does matter. I have to be more careful. And so when I continue to do it, that's suggestive that it's actually something sinister as opposed to lazy or negligent. And so that's why the fact of the investigation matters, not the conclusion of the investigation. I don't disagree that the fact of the investigation is potentially more probative, but where I was concerned was that it wasn't clear to the jury that there were findings and adverse actions taken against him. And so — But doesn't that benefit your — I thought — I would think that benefits your client. I thought that's exactly what the district court was trying to protect against. So she said you can have the fact of the investigation but not the findings because it would be too prejudicial. No. Are you arguing the opposite? No, Your Honor. I'm sorry if I was unclear. I'm arguing that it was very clear to the Is that because of the prepayment review particularly? Primarily, Your Honor. Yeah. So and I think if you look at Exhibits 34 and 35 and in addition the testimony about the prepayment review and Martin Flood is testifying about them, he says on 577 of the appendix — Was there an objection to the prepayment review being referenced? There was. I think that Mr. or Dr. Yoon clearly maintained an objection to all of this evidence coming in from the beginning. Well, I understand that he objected to all of it, but that sometimes is a problem because if the ground is the broad ground and it turns out the portion of it that's most concerning about what got in is the portion of it that disclosed findings and your contention is the references to prepayment review implicitly disclosed an adverse finding, then there's a question, was that specifically objected to? I think those documents were specifically objected to and the court said that when it admitted the documents, it acknowledged that there was an objection, said they're coming in still with the limiting instruction. You're not really answering my question with respect. There was. I'm just asking with respect to the reference to prepayment review, which is I think one of your lead points about how there was an implicit disclosure of something adverse. Yes. Was that itself identified as problematic independent of all the other grounds? I don't think there was a separate objection at trial during the testimony, but again, it came in as part of Exhibit 34. Because it seemed like there was a lot of work done by the district judge. This issue was there and she was parsing and redacting and doing all sorts of things. So it comes to a point that this is what we're going to do. And so it seems to me once you've gone through all that, if you don't like what happened the way it came in, you would have to do something else to object once that initial process is over. I think that the court acknowledged that there was an objection as to those documents when it admitted them. And I don't think at any point he said, I'm no longer withdrawing it, that these redactions solved the problem. When he made the initial objection, was the concern about adverse findings identified as one of the grounds for the objection? Yes, Your Honor. I think that goes back to the very first, when they first started talking about it in the pretrial conferences, they are saying, well, I mean, I think at some point the court says, this is not coming in. This cannot come in. Right? And so there's a concern about it. And I just don't think that the redactions. So just help me with the record. The reference to prepayment review. Yes. Is that referred to in the unredacted portion of the document that comes in? It is, Your Honor. And after the redaction was made, was there a separate objection to the document in its redacted form because there were problems with what was not redacted? There was a problem with at least one redaction. I can't say that the redaction that they continued. So the unredacted form that disclosed the prepayment review point was presented to the parties before it was actually admitted? Correct. And was an objection made at that point to the document? I don't think there were additional. There was an additional objection to redactions. I don't think that additional objection to the redaction was about the prepayment review part. So in that sense, what does that do to your argument about the 403 problem result arising from the fact that there was a disclosure of the fact that he was subject to the prepayment review process? I think when you have him. I understand the court's point, obviously. But I think when you have him objecting to that this evidence should not come in at all and certainly objecting to concerns about findings coming in and objecting and maintaining his objection, which the court, again, recognized when it admitted those documents, I think that's sufficient to preserve the issue because the issue that we're raising is that the entire investigation should not have come in and that the harm from it was significantly more than the district court thought because it didn't actually take the remedial action that it was attempting or stated that it wanted to take. I understand my time is. You have a second point you wanted to raise. I did. I wanted to talk briefly about the amount of loss issue. And I think one of the key points that I wanted to make on that was that while we obviously stand by the argument and the brief that this court's decision in Iguala has been abrogated by the 2015 amendments, I don't necessarily think the court has to reach it because the evidence here is so clear that Dr. Ewing knew exactly how much money he was getting from insurance companies and that that was his intended amount of loss. Doesn't that amount vary? This is the part I don't understand. You don't have a contract with the insurance company. You don't have a definitive expectation as to each person for which you're submitting. So you submit an amount. You write down an amount. Maybe they'll pay that. Maybe they won't. You don't really know what they're going to pay. So how do you decide, oh, it should be some lesser number because why? I mean, you're hoping you're going to get it. Maybe you will. Maybe you won't. I don't think that he's hoping that he's going to get that higher number, Your Honor, because I think the Second Circuit recognized in the decision seeing that it's common knowledge that what you bill is not what you actually get. And here, even though he was out of network. Is that true if you're a totally out of network, uncontracted person? Yes, Your Honor, because here, specifically, Martin Flood testified that even as an out-of-network provider, there are limitations and there are internal policies that govern what he can be reimbursed. And the fact witnesses, specifically Haijin Oh and Marin Kwan, testified that Dr. Yoon was very concerned and had elaborate steps taken to find out what payment was provided to him. How would you propose the district court would ascertain the number? I mean, it seems all very up in the air. So what should the court do to get, because it has to come up with a number. It can't just throw up its hands. And did your client offer a specific number? This is a real question I had for you because I know you disagree with the number that she ended up using, but I think the government says you needed to come forward with some alternative number and grounds for it. Did that ever happen? The amount is the amount paid, Your Honor. I think that was clear that that's what they were arguing for. No, no, no. But I mean, in terms of were you ever able to show that he knew that that's the amount that you're saying he clearly didn't intend to get the amount that he billed. He knew it would be something less. Yes. But is there any evidence in the record showing that he knew how much less it was going to be? There is. I mean, so there's not testimony that said, you know, for X patient, he was going to get $30 and what if he billed $100? And I acknowledge that. But there is evidence that he is keeping track for every person that comes in what their insurance company will bill or will pay for, regardless of what's billed. Because he's saying to people, like Haijin Oh testifies to this repeatedly, that he's monitoring how much is actually received versus the claims submitted. And Dr. Marin Kwan says, why are you, he said to her, why are you spending so much time with that patient? They have a low reimbursement rate. There are other times where he would comment on a policy paying more. So it's clear that he knew there was a substantial difference between those two numbers. But here's, maybe just to put it this way, you make an argument that given all of the evidence you just showed, it's implausible to say that his subjective intention was to get the billed amount. And I think you're further saying it's also inconsistent with the objective view of the bill. Correct. But couldn't we say the same thing, that it seems implausible that his subjective intention was only to get whatever it happened they paid him? No. Because clearly he wanted potentially not knowing what they're actually going to pay him. It may have been he wanted more than that, even though it wasn't going to be as high as the billed amount. And wouldn't that also correspond to an objective view of what a person in this situation would want? And so I think Judge Rippleman's question is, was there any attempt by the defendant to offer an amount that would capture that reality? Less than what I'm billing, but more than whatever it is that they happen to send me in the check. There was no alternative number other than the paid amount. And so that's what we are saying should have been the loss amount. But I think that is in line with the evidence that says he knew exactly how much money he was going to get. And so the district court in its conclusion says that he had something in mind and he billed until he got to that number. But even if that's the case, the amount that he was intending to get is the amount that he actually received. So for example, if he was billing $500 but he knew that the insurance company was going to pay $100 per visit, but he wants $500, right? But counsel, I guess if that was so clear and he knew that, that's what my question was about, then why wasn't there evidence to show that he knew that whenever he billed $500, he would get $500. For $500, he would only get $100. And it seems like you're saying there isn't really that kind of specific evidence. There's just general testimony that he understood generally how the insurance companies paid. I don't think that's a fair reading of the evidence, Your Honor. And I'm sorry if I'm being unclear about that. The testimony from at least two of these witnesses is that for when patients came in, he knew exactly, he found out how much their insurance covered, right? And that is how he determined how many times to bill them because I guess he knew what he wanted to get. And so that amount to determine how many times he submitted the bill for to get to that amount. So with the example that I was giving, even if he submits five bills, which add up to like a billed amount for $2,500, he knew that they were only getting $100. And that's what he was trying to get to. The amount that he subjectively and objectively intended is the $100. So you're saying there's evidence that he granularly understood that for Mr. A-Frame, they're going to reimburse $100 a visit and I'm going to do five? I mean, you think there's... Yes, there's evidence of that. He had that kind of specific understanding? Yes, and there's evidence of that. I'm looking at pages 615, 618 to 620. All page numbers are references to the appendix. 618, 619, that's where they said for new patients we had to find out what sort of coverage he had. 620, he was aware and he acknowledged how much money he was paid. He would comment on a policy being pretty good if it paid more. That's at 832 to 833. That's with Marin Kwan. And then at 836, he's saying that he discussed how much insurance companies paid by the billing code. So I think that is sufficient to meet the burden of showing his subjective intent. And I recognize I've gone way over time, so thank you. Thank you, counsel. Will counsel for the appellee please come up and introduce yourself on the record to begin? Good morning. May it please the Court, Karen Eisenstadt for the government. Unless the Court has a different preference, I was going to start back at the investigations issue that counsel started with. Just to clear up some record questions that the Court has raised, the redactions on Exhibit 34, which is the one that's the letter that says you're on prepayment review, those were all agreed to redactions. So if you look at page 555 of the appendix, counsel comes in and tells the Court, okay, we've come to an agreement on all the redactions except one. The one that's disputed is on a different exhibit. It was Exhibit 35. So 34 was a completely agreed-upon set of redactions. So the record is clear why the Court admitted this evidence. So what the government specifically argued at different times doesn't really matter. Though the government actually did argue, I think, what Judge Rickman suggested, and that's on pages 1231 to 1232 of the appendix. Basically, we're trying to rebut this negligence good-faith defense that he's already signaled he's going to make. Billing is complicated, he's overworked, his staff isn't sophisticated, but that's not intentional fraud. It's more like bad housekeeping or bad office work. So that was the defense that the knowledge of the investigations was meant to rebut. The Court recognized that there is a risk of unfair prejudice, certainly from giving information of other investigations, but drew appropriate lines specifically to avoid suggesting an alternative standard of guilt or bring in propensity evidence or trying to suggest propensity inferences. So she excluded specifics about what was being investigated, and specifically also the findings of the investigations. And then with the 2018 letters, including the Exhibit 34, where it's pretty clear now there are findings because he's being put on prepayment review, she gave the limiting instruction that the parties jointly crafted and proposed to try to address and mitigate that risk. In addition, as argued in the government's brief, our view is also that even if there were some error on the margins on one redaction or some bit of it, it's harmless because not only did he not dispute that the claims were false, like these were not correctly billed claims, but also the evidence of willfulness that these were intentionally false was, in fact, overwhelming. If the court has no further questions about that issue, I was going to go to the loss calculation. The Alpha's presumption is, in fact, the law of the circuit. A bill is a bill. The court may presume that you asked for that amount because you want that amount, but, of course, you can rebut the presumption. The district court didn't clearly err here in finding that Yoon failed to point to enough. Just on that point, what is the significance of the language, I don't know if it's in the commentary or the application note, about government insurance? So the argument that Mr. Yoon is suggesting is that that implies an intent not to apply that presumption to anything else like non-government health care programs. I think it's clear that's not true because Alpha's itself was decided in the face of that. But just help me understand, why is that in there? If Alpha's is right, it does seem a little strange. Why disaggregate out the government insurance? Well, I don't think the Alpha's presumption necessarily is true in all the circuits, so it may be that there... Yeah, that's what I'm a little concerned about. Yeah, I haven't done a check, but I don't think that's a universal proposition before. So does the government have a view? I don't know how you argue in other circuits, but, I mean, how do we handle the fact that there is this commentary that seems to suggest there's an appropriate presumption for when it's... I don't fully understand why it would be different also as to the government insurer compared to a private insurer, but nonetheless, it's there. So what is your best account of how Alpha's can be true, notwithstanding the presence of that commentary? So my understanding, Alpha's is broader than the commentary, and this court established it after the commentary went into effect, and I think that really is... that's what rebutts the expressiveness aspect of it. Suppose I thought maybe we should rethink Alpha's, and now I were to ask you, should we rethink Alpha's in light of the commentary? You would say no, because why? No, because I think when you look at Alpha's and then the cases that rely on it following, like Iwilala and Ahmed, the idea is that Alpha's is really coming from a really basic proposition about, let's say, called the Horry rule, that a bill is a bill, right? So when you submitted that, we can start with that presumption, and that's fair because if the defendant wants to claim subjectively, I had some other number in mind. I mean, the government doesn't have any... I totally get that. So then what explains the commission's inclusion of that language about presumption for the government insurer? I think the issue is, one, that Alpha's presumption is specific to the First Circuit, and so the commission is looking more broadly. I think also... But they had some thinking that said, there's some problem out here, and we're going to fix it in this commentary, and we're going to fix it, and we're going to say something special about the government and not something more generally easy to say. The answer is, this is just the general rule, but we're going to make a specific rule. And so why did they make a specific rule or a specific comment instead of a general comment? I don't recall seeing any specific reason for amendment language to this, though I can certainly check, but I don't recall seeing anything like that that would explain why they thought at that moment we need to say this specifically about Medicare. I think also, in many cases, this type of presumption is coming up because the claim is there should be an offset because some of the services I provided were legitimate. So it's like an over-billing type issue, which comes up a lot, I think, in the Medicare context. So that's a common, I think, fact pattern. This one is more like the one in EWALA where the issue is just the rate, like how much you do reimburse for this type of thing. But I guess that's what got me a little bit concerned as to whether ALFAS may have been a little bit more aggressive, and I don't even know if presumption is quite the right word as opposed to burdens of proof or something like that. But you could imagine in the government insurer context that the thought is they're just not going to check the government. So we can presume that the person who billed that amount thought they were going to get it. In other contexts, maybe we have no reason to think that is the working presumption about the attitude of the person billing, and so maybe that kind of presumption is not appropriate. But I guess that would still mean that you did bill for it, so I don't know if it's quite a presumption, but do you have anything to explain why what you billed isn't what you intended? So another aspect of government health care programs that I think is different from private is that those allowed rates are public information, so you can look it up. It's pretty complicated to look it up and figure out what goes with what. But Medicare rates are something you can look up. And so in that situation, I think you'd be like, well, I can assume that people looked it up. Private insurers, they don't publish this type of information, and I don't think if you call them they want to give you that because that would obviously incentivize people to bill. All of this discussion just makes me think maybe there is something to the defendant's point that in the non-government insurer context, there may be more reason to think that the fact that I billed something doesn't tell us as much as one might think in this context about what I'm actually expecting I'm going to get paid. And so then if there's some force to that, then why isn't the evidence that the defendant's counsel is pointing to help to make a case that here it just doesn't seem all that plausible that the defendant really expected to get what he billed? So I think actually the difference between published rates and non-pushes is in the other direction, right? So if there's a published rate, this was like a Fifth Circuit case, Valdez, where the guy's billing all the time at three times Medicare. So there's a Medicare rate. He just routinely jacks it up three times, and that's his billing practice. So there's a set rate, and that's where the number is coming from that the guy is putting on his bill. So we can assume he's not putting it there because he actually thinks Medicare is suddenly going to cough up more than they ever cough up. I think it's very different if you don't actually have any idea how much they're going to pay for something. So when you put that number on there, I think you're putting it there because that's what you want. You may think, oh, it's not likely they're going to give me this full amount, but that's a different question than whether that's what you want. And I think the court also made this distinction, not with Medicare but with in-network doctors, because you've already negotiated a rate, and so if you put something higher, I mean, you obviously know you're not going to get that, but here it would be different. Thank you. Thank you, Counsel. Well, Attorney Webster, please come up and reintroduce yourself on the record. You have a two-minute rebuttal. Thank you. Leanne Webster for Dr. Uniken. I just wanted to briefly address one issue. As to the first issue, there was no limiting instruction, so understanding even the purpose that the district court admitted this evidence for, the jury was never told this is why this evidence is being admitted. There was no limiting instruction as to the Colorado investigation, and there was no limiting instruction generally as to the Blue Cross and Blue Shield evidence. The only limiting instruction – Counsel, can I just ask you about that? I thought, and maybe I'm misunderstanding what you're saying, but I thought the court – I'm looking at the government's brief here, page 7. I thought the court said so for Exhibit 34, which is the prepayment review exhibit that you've identified as critical to your argument. The government is – I'm just reading from the government's brief. The government is offering this exhibit as evidence of Dr. Yoon's knowledge and state of mind, and in that regard you may consider whether he was made aware of the communication, et cetera. I thought that was the limiting instruction about why it was being offered. Yes, Your Honor. So that was – I wasn't trying to deceive the court. That was the next point I was going to make. There was a limiting instruction as to these exhibits, only when these exhibits came into evidence. There was no limiting instruction generally about the fact of the investigation, and even that limiting instruction, when it says it's relevant to knowledge and state of mind, that doesn't limit the jury from considering as he's committed fraud before, maybe he's committing fraud now, Blue Cross Blue Shield has determined that he's committed fraud, and so he should – we should also defer to Blue Cross Blue Shield's determination. And so I don't think that that – You don't think the part of the instruction where the court said the statements inside the letter are what we call hearsay and they can't be considered by you as to whether they're true or false? You don't think that addresses what you've just reported? Because there was also testimony about the prepayment review. It wasn't just in the letter. There was also testimony where Martin Flood testified about it, and the government specifically referred to the prepayment review and its closing for the truth of the matter, Your Honor. Thank you. Just as to that point on the testimony, was there then a separate objection to the testimony? Your Honor, he objected to all of it coming in. So he didn't specifically object when Martin Flood testified about the prepayment review, if that's your question. Right, but I guess what I'm – you object to all of it. Yes. You agree to redactions that are going to mention prepayment review. I understand that there's still an objection to the – There's no objection to the limiting instruction as to the exhibit, or was there? So, again, there are still objections to the documents coming in in total, right, and that was acknowledged. And then if I – I know this is not in my brief, but there's a case, United States v. Garcia Sierra. It's 994F317 from the circuit in 2021. And specifically in that case, the limiting instruction was jointly requested by both parties, and this court still found that the nature of the instructions prevented them from focusing the jury's attention on the permissible use of the 404B evidence and said that that instruction, despite being requested by both parties, was insufficient to cure the prejudice. Although, to be clear, the court later found that it was harmless, so I don't want you to think I'm misleading you, but thank you. Thank you. Thank you, counsel. That concludes arguments in this case.